**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 21-MJ-8392-WM

UNITED STATES OF AMERICA

v.

**ANDRE CROOKS,**

aka, "Bighorndodge"

**Defendant.**

**CRIMINAL COVER SHEET**

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?  ___ Yes  ✓ No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?  ___ Yes  ✓ No

3. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?  ___ Yes  ✓ No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

BY:    *Gregory Schiller*

GREGORY SCHILLER
ASSISTANT UNITED STATES ATTORNEY
District Court No. A5501906
500 South Australian Avenue, Suite 400
West Palm Beach, Florida 33401
Tel:      561-209-1045
Fax:
Email:    gregory.schiller@usdoj.gov

AO 91 (Rev. 08/09)  Criminal Complaint

**FILED BY** ___ *KJZ* ___ **D.C.**

*Oct 12, 2021*

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

# UNITED STATES DISTRICT CO

for the

Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.  21-MJ-8392-WM |
| ANDRE CROOKS, | ) | |
| aka "Bighorndodge", | ) | |
| | ) | |
| _____ *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of December 2020 through October 2021 in the county of _____ Palm Beach _____ in the

_____ Southern _____ District of _____ Florida _____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to distribute controlled substances |
| 21 U.S.C. § 841(a)(1) | Distribution of controlled substances |
| 31 U.S.C. § 5324(a) and (d)(2) | Structuring transactions to evade reporting requirements |
| 18 U.S.C. § 1956(a)(1)(A)(i) | Money laundering |

This criminal complaint is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

FBI Special Agent Gregory Hoffman
*Printed name and title*

Subscribed and sworn to before me in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone (FaceTime).

Date:   October 12, 2021

_____
*Judge's signature*

City and state:        West Palm Beach, Florida

William Matthewman, United State Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF ARREST WARRANT

I, Gregory Hoffman, being first duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am currently a special agent with the Federal Bureau of Investigation and have been so employed since May 2016. Following an initial five-month training period at FBI Academy in Quantico, Virginia, I was assigned to Violent Crime Squad in the Palm Beach County, Resident Agency where I have worked since August 2016. My area of work includes various violent criminal violations to include traditional narcotics trafficking, Dark Web narcotics trafficking, bank robberies, interstate stalking, violent criminal gangs, and various other violations. I have investigated and gained convictions against multiple drug traffickers engaged in the interstate smuggling and sale of narcotics both using the Dark Web, postal system, and other means of distribution, supply, and transport. I have attended conferences to receive training specific to Dark Web narcotics trafficking and other internet platforms used for illicit activities. Through my training and experience I have familiarity with investigations involving the use of computers, mobile devices, and associated software applications in furtherance of drug smuggling and other illicit activities. Such experience and training extends to investigations covering the use of The Onion Router, Virtual Private Network services, and encrypted software services used by drug traffickers to conceal their activity from law enforcement. Accordingly, I have worked numerous cases involving violations of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 843(b), that is, distribution of controlled substances and the use of a communication facility to do so.

2.      The facts set forth in this affidavit are based upon my personal knowledge, information obtained from others involved in this investigation, including other law enforcement officers, my review of documents and information gained through training and experience.  Since

1

this affidavit is being submitted for the limited purpose of establishing probable cause to support a Criminal Complaint, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only those facts I believe are necessary to establish probable cause to believe that **Andre CROOKS, aka "Bighorndodge",** (hereinafter referred to as "CROOKS") has violated Title 21, United States Code, Section 846 (Conspiracy to distribute controlled substances, to wit: cocaine and crack-cocaine); Title 21, United States Code, Section 841(a)(1) (Distribution of controlled substances, to wit: cocaine and crack-cocaine); Title 31, United States Code, Section 5324(a) and (d)(2) (Structuring transactions to evade reporting requirements); and Title 18, United States Code, Section 1956(a)(1)(A)(i) (Money laundering) on, about or between December 2020 and October 2021.

## PROBABLE CAUSE

3.       This application stems from an ongoing criminal investigation into illegal narcotics dealers operating on criminal online marketplace websites, including one known as Marketplace 1[1]. In the course of this investigation, I have learned that the Marketplace 1 is one of the many criminal marketplaces accessible through The Onion Router ("Tor") network on the "Dark Web." Marketplace 1 and other Dark Web marketplaces are designed to promote the anonymous sale of illegal items, such as narcotics, in exchange for Bitcoin and other peer-to-peer cryptocurrencies (also known as "virtual currencies"). These Dark Web drug marketplaces are made up of vendor profiles akin to those profiles or "shops" seen on websites such as Ebay.com. Each vendor profile can offer a selection of products to sell.   These products are generally different quantities of narcotics offered for sale.   Of particular interest to this matter are parcels associated to the

---

[1] Your Affiant knows the true name of the Marketplace and can provide the same to the Court if requested, but for purposes of ongoing investigations is not including the true name of the marketplace or any other marketplace in this affidavit.

operation of the crack cocaine vendor profile "bighorndodge" on the Marketplace 1 Dark Web
drug market.

### A. Background on the Tor Network and the Dark Web

4.      The Internet is a global network of computers and other devices. Devices directly
connected to the Internet are identified by their unique IP address. An IP address is used to route
information between devices. Generally, when one device contacts a second device, the first
device must be directed to the IP address of the second device. Moreover, when the first device
contacts the second device, the first device provides its own IP address to the second device, so
that the second device knows where to direct its response. Accordingly, the two connected devices
(for instance, a home computer and the www.google.com website) know each other's IP address.

5.      The typical user may not know the IP address of a website visited. Typically, a
user will type the domain name of the website—which commonly corresponds to a plain-language
name for the website, *e.g.,* www.google.com—into the Uniform Resource Locator ("URL") bar at
the top of their web browser. This domain name will be transmitted to a Domain Name System
("DNS") server, which then translates the domain name into the appropriate numerical IP address,
and thereby allows the user to connect with the requested website. Conversely, if a user knows of
a unique IP address for a particular website, generally[2] the user can type that IP address directly
into the URL bar and access the website in that manner.

6.      In addition, publicly available databases can be easily searched to obtain the IP
address for any known URL and the registered owner and location of any IP address. Thus, with

---

[2] The server or virtual server with a particular IP address can host multiple websites, in which case entering that
particular IP address would not direct a user to a single website. However, if an IP address is associated with a single
website, entering the IP address as described above would direct the user to that particular website.

additional inquiry, most any URL or IP address can be traced to its owner and physical location.[3] This is problematic for conducting online criminal activity and wishing to remain anonymous.

### B. User Anonymity Provided by the Tor Network

7.     The Onion Router (Tor) network is a special network of computers, distributed around the world, designed to conceal the true IP addresses of the users of the network. Every communication sent through Tor is directed through numerous relays within the network—and wrapped in a layer of encryption at each relay—such that the end recipient of the communication has no way of tracing the communication back to its true originating IP address.

8.     In order to access the Tor network, anyone can simply download the Tor browser software and use it to access the internet. The user simply inputs a website IP address or URL into the Tor browser and the Tor browser automatically encrypts and routes the communication through several relays and then out to the destination so that the destination website can only see the IP address of the last (or "exit") relay and not the IP address of the device actually connecting to the destination website.

9.     By way of illustration, in a standard internet communication, when a person connects to a website, that website can see that person's IP address:



In this illustration of a standard internet connection, the website www.google.com can see the home computer IP address (123.456.789) and, of course, the user of the home computer knew the

---

[3] Private individuals operating home computers usually do not own and register their own IP address; instead, they subscribe to broadband accounts with ISPs, such as Comcast or AT&T, which in turn assign or lease an IP address to them (the subscriber). Nevertheless, the IP address can usually be traced to its assigned user at a given point in time using the ISPs' records of which subscriber was assigned which IP address and when.

URL, and therefore the IP address, of www.google.com, which the user had to type into his browser to connect to the website in the first place. Thus, each user's IP address is known to the other, and the owner and location of both can later be traced. Similarly, any person monitoring the internet traffic at a point between the two IP addresses, would see the connection between IP address 123.456.786 and www.google.com, and know that those two devices were communicating.

10. On the other hand, in the case of a Tor network communication, when a person connects to a website, the traffic is encrypted and routed through multiple relays, and that website cannot see that person's IP address:



In this illustration of a Tor network connection, the website www.google.com *cannot* see the home computer IP address (123.456.789); instead, it only sees the IP address of the device it is directly connected to, in this case, the third (or "exit") Tor relay, with IP address 003.003.003, which cannot be traced back to the home computer user. In addition, any person monitoring the internet traffic at a point between the home computer and www.google.com would *not* know that those two devices were communicating. Instead, depending on the monitoring point, that person would only see the direct connections between the home computer and first (or "entry") Tor relay, between the first and second, or second and third Tor relays, or between the third (or "exit") Tor relay and www.google.com.

11. As with a standard internet connection, the user must have known the URL or IP address of the website in order to have directed a connection to it through the Tor network.

Accordingly, although the IP address of the user is hidden from the website, the IP address of the website must be known to the user—the anonymity is only one-way. The Tor network addresses this one-way anonymity through a feature known as "hidden services."

### C. Hidden Services: Website Anonymity Provided by the Tor Network

12. To achieve true, two-way anonymity, the Tor network also enables websites to operate inside the network in a manner that conceals the true IP address of the computer server hosting the website. Such "hidden services" operating on Tor have complex web addresses, generated in a computer algorithm, ending in ".onion." Unlike a standard URL, there is no way to retrieve a website server's true IP address from its .onion Tor address alone. This alleviates the need for a Tor network user to know the true IP address of a website. Rather the user can direct his/her Tor browser to the .onion address, reach the website, and neither the user nor the website knows the other's IP address—two-way anonymity is achieved. This network of anonymous users and websites is the Dark Web.

13. Criminals have taken advantage of the Dark Web to create websites with online marketplaces dedicated to the trafficking of controlled substances and other illicit goods. Websites such as www.deepdotweb.com maintain an overview of illegal marketplaces operating on the Dark Web, and how-to guides such as: "How to Buy Drugs Online from Darknet Markets."[4]

### D. Description of Involved Marketplaces

14. Marketplace 1, Marketplace 2, Marketplace 3, and Marketplace 4 (collectively referred to herein as the "Subject Marketplaces") all function as an intermediary between buyers and sellers. Sellers create accounts in the Subject Marketplaces to advertise their products, such

---

[4] https://www.deepdotweb.com/2015/12/30/buy-drugs-online-from-darknetmarkets/. This website has been seized by federal law enforcement agencies.

as narcotics or hacked computer passwords, and buyers create accounts to browse sellers' products and purchase them; in this regard, the Subject Marketplaces' website interfaces are similar to well-known, legitimate online marketplaces.

15.     The Subject Marketplaces perform moderator and maintenance services, such as receiving complaints, providing technical assistance, and allowing customers to post reviews of their vendors.  The marketplace also provides a means by which its users can communicate with its administrators and operators.  The Subject Marketplaces also charge a commission from every transaction as a percentage of the sale price.

16.     However, unlike legitimate online marketplaces, the Subject Marketplaces are dedicated and designed to facilitate the sale of contraband, such as illegal narcotics and drug paraphernalia.   Illegal drugs, such as methamphetamines, heroin, and cocaine, are openly advertised and sold and are immediately and prominently visible on the websites.  The websites are specifically designed to facilitate illegal commerce by working to ensure the anonymity of its administrators, as well as of the buyers and sellers who participate in commerce on the website. The websites are designed to achieve this anonymity primarily by operating as a hidden service on the Tor network.  To further promote anonymity, purchases are made primarily in Bitcoin (or other virtual currency) using the websites' escrow services.

### E.  Bighorndodge Crack Cocaine Vending on Marketplace 1

17.     In November 2020, investigators with the Northern California Illicit Digital Economy ("NCIDE") Task Force, located in Sacramento, California, began an investigation into a user of online Dark Web moniker "bighorndodge" on the Marketplace 1.  On or about November 24, 2020, an online undercover employee (hereinafter "OCE") conducted a purchase of one gram

of crack cocaine from the "bighorndodge" moniker in exchange for cryptocurrency. Figure 1 is a screenshot of a photo posted on the "bighorndodge" vendor profile.



18.     On or about November 27, 2020, a parcel arrived at the address the OCE provided to "bighorndodge" containing a substance concealed in a silver mylar baggie that returned a field test result for "Cocaine Base," also known as "Crack Cocaine" (hereinafter "Subject Parcel A") The sender address on Subject Parcel A was as follows: Gregory Glassgow, 5115 Norma Elaine Rd, West Palm Beach, FL 33417-4738.

19.     A review of commercial databases, the Palm Beach Property Appraiser website, and the Florida DMV DAVID database could not link any individual as currently associated to an address of 5115 Norma Elaine Road, West Palm Beach, Florida.  Surveillance conducted on April 14, 2021, determined that the address was a vacant lot with residential structures on either side.

20.     A review of postal databases for information about Subject Parcel A determined that the postage was paid through Pitney Bowes, a third-party postage vendor, by a Pitney Bowes customer with the following information:

| | |
|---|---|
| Name: | Gregory Glassgow |
| Address: | 5115 Norma Elaine Rd. West Palm Beach, FL 33417 |
| Phone Number: | (844) 445-5854 |

21.     Further database research into the identity "Gregory Glassgow" with a home address of "5115 Norma Elaine Rd. West Palm Beach, FL 33317" revealed a registered user of USPS online services, username: "guysnight76," with a matching name and address.  Additional database research into username "guysnight76" revealed access to USPS systems through multiple IP addresses, including Comcast IP Address 2601:587:302:b7a0:583:b286:df2f:4cc7 on October 31, 2020.  A subpoena to Comcast determined the customer account assigned that IP Address on

October 31, 2020 was "Andre Crooks" (hereinafter "CROOKS") of 547 Gazetta Way, West Palm Beach, FL 33413 (hereinafter "Subject Residence 1").

### F. Subject Parcel B

22.     On March 27, 2021, a different OCE located in Palm Beach County, Florida conducted a second online purchase of narcotics from the "bighorndodge" vendor profile on Marketplace 1 for 7 grams of crack cocaine. The OCE paid in cryptocurrency and provided a shipping address monitored by USPIS. Several days later, USPIS inspectors located a parcel shipped to the provided address that had entered the mail stream in Palm Beach County, Florida (hereinafter "Subject Parcel B"). Subject Parcel B was found to have the exact same "Gregory Glassgow" sender information that sent Subject Parcel A.

23.     USPIS inspectors seized Subject Parcel B and opened it in conjunction with investigative partners. Within it, investigators found a silver mylar bag containing approximately 7 grams of what appeared to be crack cocaine. A chemical field test of the suspected crack cocaine returned a positive result for cocaine. A subsequent lab test returned a reported result of cocaine.

### G. Subject Parcel #1

24.     On April 13, 2021, a Drug Enforcement Agency (DEA) agent, in conjunction with this investigation, established surveillance at Subject Residence 1. Prior to establishing surveillance, agents determined that Subject Residence 1 was in CROOKS's name through a check of the Palm Beach Property Appraiser website. Parked in front of Subject Residence 1 was a white, Nissan Pathfinder bearing Florida license plate PK230J (hereinafter "Nissan Pathfinder"). At the time of this surveillance, a Florida D.A.V.I.D. search revealed the license plate to be a dealer's plate registered to Gallimore Motor Group, LLC at 1562 Windorah Way, Apt. F, West Palm Beach, Florida, 33411.

25.     The DEA agent observed CROOKS leaning inside of the Nissan Pathfinder. Agents recognized CROOKS by previously having viewed his photograph on the Florida D.A.V.I.D. database. CROOKS had the driver's side door and the rear driver's side passenger door open and appeared to be rifling through the Nissan Pathfinder. The DEA agent then observed CROOKS close both doors, walk away, and disappear into Subject Residence 1. Shortly thereafter, the DEA agent observed CROOKS enter the Nissan Pathfinder and drive away from Subject Residence 1.

26.     The DEA agent followed CROOKS southbound along Jog Road. At approximately 2:44 P.M., CROOKS arrived and parked at the United States Postal Service (USPS) facility located at 4300 Jog Road, Greenacres, Florida. The DEA agent observed and filmed CROOKS exit the Nissan Pathfinder and enter the rear driver's side passenger compartment of the Nissan Pathfinder where he emerged carrying a white USPS mail bin filled with flat rate envelopes. The DEA agent then witnessed CROOKS carry the full mail bin into the USPS facility at approximately 2:46 P.M.

27.     The DEA agent then followed CROOKS into the USPS facility shortly thereafter. Upon entering, the DEA agent observed CROOKS walking away from the prepaid mail drop-off area of the USPS facility still carrying the USPS bin. The agent noted that though CROOKS had entered the Post Office carrying the bin with two hands, as if it was full, he departed the Post Office carrying the bin in one hand, as if it was no longer full. Additionally, on his way out of the Post Office, the DEA agent observed CROOKS take a handful of empty flat rate envelopes from a supply counter before exiting the USPS facility.

28.     The DEA agent then exited the USPS facility after CROOKS and observed CROOKS leave the parking lot in the Nissan Pathfinder. The DEA agent followed CROOKS to

a different USPS facility located at 4151 Lake Worth Road, Lake Worth, Florida, at approximately 2:57 P.M.

29.    USPIS personnel responded to both facilities and reviewed the labels of Priority Mail envelopes entered into the mail stream at both facilities that day.  USPIS personnel located multiple envelopes bearing the same "Gregory Glassgow" sender information matching Subject Parcels A and B previously obtained in this investigation.   USPIS personnel seized one of these

parcels, bearing USPS Tracking # 9470 1092 0556 8343 6402 28 (hereinafter referred to as the "Subject Parcel #1"). *See* Figures 2 and 3 of the seized parcels.




30.    On April 14, 2021, Palm Beach Sheriff Office Deputy Mark Alexander and his certified police working dog Canine Blitz conducted a sniff test involving a lineup of six packages of similar characteristics to that of Subject Parcel #1, in West Palm Beach, Florida.  During this test, Canine Blitz was given an opportunity to sniff and react to each of six parcels, which were lined up in random order.  During the test, Canine Blitz reacted to Subject Parcel #1 with USPS tracking # 9470 1092 0556 8343 6402 28 by giving a "full sit," which was the response Canine Blitz was trained to give when he detected the odor of a narcotic type he had been previously trained on.  Canine Blitz did not react to any other parcel.  The test indicated that Canine Blitz identified a narcotics odor emanating from Subject Parcel #1.

31.    Subject Parcel #1 was opened on April 22, 2021 pursuant to a federal search warrant (Federal Warrant #21-MJ-8145-BER).  Within Subject Parcel #1, law enforcement recovered a

white chalk-like substance that agents recognized, through their training and experience, to be consistent in appearance with cocaine. Agents weighed the substance and determined it weighed approximately 18 grams. A TruNarc field test kit returned a positive result for Cocaine HCL, which agents know, through training and experience, to be a salt form of cocaine.

32.     On April 15, 2021, law enforcement agents established surveillance at Subject Residence 1.   CROOKS was again observed departing Subject Residence 1 in the Nissan Pathfinder. Agents observed CROOKS proceed in the Nissan Pathfinder to a Wells Fargo Bank branch located at 4900 Okeechobee Blvd., West Palm Beach, FL 33412. Agents observed CROOKS exit the Nissan Pathfinder, enter another vehicle, and depart the area eastbound on Okeechobee Blvd.

33.     While CROOKS was away from the Nissan Pathfinder, Deputy Alexander, previously identified above, used his assigned police Canine Blitz, also previously identified above, to conduct a free air sniff of the vehicle. Deputy Alexander brought Canine Blitz over to the driver's side of the Nissan Pathfinder and had him begin his free air sniff/search of the vehicle from the starting sequence. Canine Blitz began to move from the driver's front wheel well, and came to the 'B' pillar, on the driver's side. Canine Blitz did come to a sit on his final indication for the presence of the odor of narcotics, for which he is trained and certified to detect.

34.     Federal agents working on this investigation obtained a vehicle tracker warrant for the Nissan Pathfinder (21-MJ-8149-WM), but CROOKS was no longer seen driving or in possession of this vehicle and thus the warrant could not be effectuated.

35.     On April 30, 2021, agents established surveillance at Subject Residence 1. CROOKS was observed leaving Subject Residence 1 in a new vehicle - a white Toyota sedan

(hereinafter "White Toyota"), bearing license plate QICB56, registered to S.D.Rios[5] per the Florida D.A.V.I.D., which included a residential address of 37 Danbury Court, Royal Palm Beach, FL (hereinafter "Subject Residence 2"). Agents maintained surveillance of CROOKS as he proceeded eastbound to Interstate 95 and southbound to the exit for 10th Avenue North in Lake Worth, Florida. After initially exiting the highway and proceeding westbound, CROOKS abruptly turned his vehicle into a U-turn and began accelerating eastbound on 10th Avenue North. CROOKS traveled eastbound through at least one red traffic light at a relatively high rate of speed. In my training and experience, I recognize this maneuver to be a technique commonly used by drug traffickers and other criminals to identify law enforcement surveillance units that may be following the individual engaged in irregular driving. Agents suspended surveillance at this time to avoid creating traffic dangers to uninvolved drivers and mitigate any suspicions CROOKS may have developed regarding law enforcement attention.

36.     During subsequent surveillance efforts, agents identified CROOKS driving a charcoal grey Mazda 6, Florida License plate, PK230J (hereinafter "Mazda 6").[6] A search of the Florida D.A.V.I.D. revealed this license plate was a temporary license plate and no longer assigned to a vehicle. On May 13, 2021, agents saw the Mazda 6 parked directly in front of Subject Residence 2. CROOKS was also seen in the vicinity of Subject Residence 2 during other surveillance efforts.

37.     On May 27, 2021, a DEA agent conducted surveillance at Subject Residence 1 and observed the Mazda 6. Subsequently the agent parked in a nearby parking lot approximately a

---

[5] Florida D.A.V.I.D. records produced the full name of S.D.Rios, whose name is being redacted from this publicly available document as the investigation continues.

[6] A separate GPS tracker warrant was obtained for the "Mazda 6" vehicle, but was unserved because CROOKS no longer possessed the vehicle during allowed time for the execution of the tracker. *See* 21-MJ-8265-SMM.

half-mile from Subject Residence 1. While there, the agent observed S.D.Rios arrive in the White Toyota and park in the same public parking lot. S.D.Rios exited the White Toyota and appeared to be holding a purse and a white plastic bag with an unknown object inside. The Mazda 6 then arrived at the same area, S.D.Rios entered the Mazda 6 with the two items, and the vehicle left the area. Later, the Mazda 6 returned to the public parking lot and dropped S.D.Rios off at her vehicle. The agent observed S.D.Rios now only in possession of the purse without the white bag, then enter the White Toyota and departed the area. The agent recognized CROOKS as the driver of the Mazda 6 when S.D.Rios was picked up and dropped off.

38.     Through my training and experience, your affiant recognizes the persistent switching of vehicles as well as meeting individuals near, but not at, the target's residence, to be, when taken together with the additional context provided herein, indicative of evasive techniques employed by drug traffickers to frustrate law enforcement investigation.

### H. Subject Parcels #2 & #3

39.     On June 9, 2021, Agents began surveillance at Subject Residence 1. Parked in front of the residence were the Mazda 6 and a black Chevrolet Suburban (hereinafter "Suburban"), Florida dealer license plate, PK230J. Agents positively identified CROOKS and observed him switch Florida license plate number PKJ230J off of the Mazda 6 and onto the Suburban. CROOKS made multiple trips from inside Subject Residence 1 to the Mazda 6 and the Suburban, and enter and exit both vehicles, appearing to rifle through them. Shortly thereafter, agents observed CROOKS enter the driver's seat of the Suburban and drive away from Subject Residence 1.

40.     At approximately 11:25 a.m., PBSO aviation observed CROOKS arrive at the United States Post Office located at 4151 Lake Worth Road, Lake Worth, FL, 33461. CROOKS was observed via surveillance video from the Post Office entering the same carrying a USPS white

14

bin with packages inside it and emptying the bin into an outgoing mail slot inside the post office. Shortly thereafter, PBSO aviation observed CROOKS exiting the post office carrying an empty bin. CROOKS was viewed putting the empty bin into the Suburban and driving away from the post office.

41.    CROOKS was then observed to proceed to, and park in the vicinity of 5408 Trevor Circle, West Palm Beach, FL. CROOKS was observed exiting his vehicle and proceeding on foot to a nearby building at 5449 Trevor Circle, West Palm Beach, FL, appearing to enter an unknown apartment. Through the surveillance operation, PBSO aviation observed multiple highly irregular driving patterns engaged in by CROOKS. For example, CROOKS loitered in the Suburban for an extended period of time in a building parking lot without putting the Suburban in a parking space, before leaving (*see* Figure 4 - aerial photograph). Irregular driving patterns and false stops are all techniques used by criminal actors to identify whether they are being followed by law enforcement.



42.    USPIS responded to the United States Post Office located at 4151 Lake Worth Road, Lake Worth, FL, 33461, and reviewed the labels of Priority Mail envelopes entered into the mail stream. USPIS personnel located multiple envelopes bearing the same "Gregory Glassgow" name previously used by CROOKS on Subject Parcels A, B and #1, also containing illegal narcotics. USPIS seized two of these parcels (hereinafter "Subject Parcel #2" and "Subject Parcel #3"), to which a narcotics detection dog (as with Subject Parcel #1 above) alerted to and were later searched pursuant to a sealed federal search warrant (21-MJ-8236-WM). The search revealed both parcels to contain powder cocaine, weighing a combined total of 178.7 grams.

43.    An investigation into the residents of 5449 Trevor Circle, West Palm Beach, FL (see

above) determined that Kiana SANTIAGO (SANTIAGO) paid for utilities at Apartment 102. Upon researching the identity of SANTIAGO, agents determined that SANTIAGO was a girlfriend of Miguel VERDUZCO (VERDUZCO) who was convicted of sale of cocaine in August 2015 and sentenced to 1 year in the county jail (*see* Palm Beach County case # 2015-CF-001881-AMB).

44.     Federal agents discovered that approximately two weeks earlier, on May 27, 2021, a PBSO deputy conducted a traffic stop on a Silver GMC Yukon operated by VERDUZCO with SANTIAGO sitting in the passenger seat of the vehicle.  The smell of marijuana emanated from the vehicle.  At first VERDUZCO said he had a medical marijuana card, but could not produce it, and when he opened the glovebox to retrieve documents, a mason jar with marijuana leaves was visible.  Both occupants were detained.  A search of the vehicle by PBSO revealed over one hundred prescriptions pills of various types, and, in plain view inside an open purse, multiple plastic baggies of a white powdery substance recognized by the deputy as appearing to be consistent with cocaine, which returned a positive field test for cocaine.  The total weight of the baggies containing the suspected cocaine was approximately 34 grams.

45.     An additional search of the car revealed a black backpack.  Inside were two red capsules containing a white powdery substance, a green pill stamped with a kangaroo image, and a blue capsule containing a white powdery substance.  The substance recovered from within the capsules were field tested and returned positive for Fentanyl.  The bag further contained, among other things, VERDUZCO's medical marijuana card, a title to a 2009 Honda "UT" vehicle, a vehicle registration for Florida License Plate PK230J (the same Tag previously identified in CROOKS' possession), and a vehicle registration for Florida dealer tag PK231J.  VERDUZCO and SANTIAGO were both arrested.  VERDUZCO was charged with trafficking in oxycodone and possession of fentanyl; SANTIAGO was charged with possession of cocaine and alprazolam

with intent to sell (see Palm Beach County case # 2021-CF-004443-AMB).

46.     Following his arrest VERDUZCO made multiple phone calls to SANTIAGO (who had been released on bond) via the Palm Beach County Jail recorded phone system.  SANTIAGO made statements to VERDUZCO that in sum and substance asserted that VERDUZCO's best friend "Dre" would be returning from Orlando soon to assist in bailing VERDUZCO out of jail. SANTIAGO also complained that she wanted "Dre" to return sooner to assist in VERDUZCO's situation.  Your affiant suspects that "Dre" may be short or the nickname for "Andre," as in Andre CROOKS.

### I. Subject Parcel #4 and Money Parcels

47.     Based upon CROOKS' known association with S.D.Rios, a notification request was put into the USPIS system such that parcels to or from S.D.Rios would alert.  On June 9, 2021, at approximately 2:45 p.m., an unknown individual mailed a parcel from a United States Post Office in Norco, California with tracking number EJ813166632US and addressed to "S[.] Rios, 37 Danbury Court (Apt. A), Royal Palm Beach, FL, 33411" (Subject Residence 2).  The return address was listed as "David Hudson, 3263 Cambridge Drive, Chino, California, 91709" (hereinafter "Subject Parcel #4").

48.     On June 10, 2021, at approximately 2:30 p.m., Subject Parcel #4 arrived at the Post Office located at 3200 Summit Boulevard, West Palm Beach, FL, 33406.  PBSO Sgt. Combs, along with his certified canine partner "Kaya," responded to conduct an investigative sniff on Subject Parcel #4.  In the investigative sniff, Subject Parcel #4 was placed in an open-air setting among other similar sized parcels along the floor of the post office.  Subject Parcel #4 was examined by canine "Kaya," who alerted to the presence of narcotics at Subject Parcel #4. Your affiant is aware through his training, experience, and being advised via Sgt. Combs and other law

enforcement personnel, that trained narcotics dogs will alert to parcels containing currency in particular circumstances - that is when such currency has taken on the substantial odor of narcotics for which the canine has been trained. This circumstance can occur when the currency is in the proximity of such narcotics for a prolonged period of time. Subject Parcel #4 weighed approximately 25 ounces (*see* Figure 5).



49.    A federal search warrant for Subject Parcel #4 was authorized out of the Southern District of Florida (21-MJ-8243-WM) on or about June 15, 2021. Within the parcel, agents recovered $20,300 in US currency hidden within a paperback book. This currency was seized and entered into evidence. A subsequent review of postal databases and subsequent subpoena to Comcast revealed that on June 15, 2021, an individual using the Comcast Account of customer "Andre Crooks" at service address of Subject Residence 1 had accessed USPS.com in order to track the whereabouts of Subject Parcel #4.

**J. Parcels mailed to Subject Residence 2**

50.    On or about August 23, 2021, three (3) flat rate USPS parcels were mailed to S.D. Rios at Subject Residence 2. The return address listed on the parcels, featuring an address outside of the Southern District of Florida, included the name of a sender (hereinafter as "Fictitious Return Address/Sender") who did not match the listing address in the public database. Your affiant is aware through training and experience, that individuals using USPS to send narcotics or other illicit goods often employ fictitious or incomplete sender/return information to obscure the origins of such goods.

51.    On or about August 24, 2021, an agent established surveillance at Subject Residence

18

2 and observed a USPS carrier drop off the three (3) parcels in the vicinity of the apartment's front door at approximately 4:02pm.  Approximately one hour later, the agent then observed CROOKS arrive at Subject Residence 2 in the Mazda 6 bearing FL license plate PK230J.[7] CROOKS first stopped his car at the bank of apartment complex mailboxes and retrieved mail from it.  CROOKS then parked his car in the assigned spot for Subject Residence 2, exited the vehicle, and then approached the front door.  CROOKS then recovered the three (3) parcels left at the front door of Subject Residence 2 before entering it.  Approximately three minutes later, CROOKS exited the apartment with the three (3) flat rate parcels, entered the Mazda 6, and departed the area.  The agent then departed the area and drove twenty minutes to one of the entrances of the gated community in which Subject Residence 1 is.  Shortly after arriving, at approximately 5:33pm, CROOKS arrived at the entrance of the community and proceeded into it.   Your affiant knows from personal experience that the drive between Subject Residence 2 and Subject Residence 1 is usually approximately twenty to thirty minutes.

52.     On or about August 25, 2021, two (2) flat rate USPS parcels were mailed to S.D. Rios at the Subject Residence 2.  The two (2) parcels again featured the Fictitious Return Address/Sender in the same manner as above.  USPIS personnel obtained the two (2) parcels from the mail stream on or about August 26, 2021 and contacted PBSO for assistance.

53.     On or about August 27, 2021, Sgt. Anthony Combs responded to USPS offices to assist with PBSO Caine "Cero" – a police working dog trained to alert when detecting cash, to conduct an investigative sniff test of the parcels alongside several other similarly sized parcels.  Cero alerted the odor of money at the two (2) parcels sent from the Fictitious Return Address/Sender.  The parcels were then re-entered into the mail stream for delivery.

---

[7] During the course of this investigation, agents observed CROOKS use this license plate on multiple cars.

54.     That same day, at approximately 1:00PM, an agent drove past Subject Residence 1 and noted the Mazda 6 from August 24 and the Suburban with FL Plate JNLF72, parked outside of it.  The agent then drove to Subject Residence 2 and noted that a white Toyota Camry, registered to S.D. Rios per Florida D.A.V.I.D., was parked in the assigned parking space.  At approximately 3:08pm, the agent observed a USPS mail carrier drop off the parcels at the front door of Subject Residence 2.  At approximately 6:13pm, the agent observed CROOKS and S.D. Rios arrive at Subject Residence 2 in the Toyota Camry.  The agent observed CROOKS exit the vehicle and retrieve the two (2) parcels and return to the Toyota Camry for a short time before entering Subject Residence 2 with the parcels.  CROOKS and S.D. Rios then exited Subject Residence 2 with CROOKS carrying two paperback books in his hands but no parcels.  The agent noted the two books had blue painter's tape closing them off at the top and bottom.  CROOKS and S.D. Rios then departed Subject Residence 2.  The use of a paperback book to hide money was observed by agents earlier with Parcel #4.  Photographs of CROOKS with the parcels can be seen in Figures 6 and 7 :

 

55.     A review of USPS database systems revealed that between July 30, 2021 and September 1, 2021, over twenty (20) Priority Mail Express parcels had been sent from the town of the Fictitious Address/Sender, as indicated above, as well as one immediately next to it.  These parcels were also overwhelmingly paid for through the use of the same online postage company with only one exceptional case in which the sender paid retail.

56.     On September 30, 2021, an agent conducted surveillance at Subject Residence 1.  At approximately 2:45pm, the agent observed only a white work-type van in the driveway of Subject Residence 1.  Approximately one half hour later, the agent drove by the residence a second time and observed the White Toyota known by law enforcement to belong to S.D. Rios and the gray Mazda 6 known to belong to CROOKS.  The White Toyota was parked in the driveway along the work van and the Mazda 6 was parked in front of the driveway, effectively blocking in the work van.

### J. CROOKS' Connection to Other Dark Web Marketplaces

57.     On or about April 14, 2021, law enforcement in the Southern District of Florida conducted an online purchase on the Marketplace 2 from vendor "Bighorndodge" for 14 grams cocaine and 7 grams crack cocaine.  On or about April 20, 2021, the agent received the following message from the vendor "...I have finally been able to log into this site after nearly a week, it was shipped today, you should have it tomorrow, very sorry this is how our first transaction went, I always ship same day, but couldn't get onto the site."  On or about April 23, 2021, investigative personnel recovered and opened a parcel received at the address provided to Bighorndodge on Marketplace 2 (hereinafter "Subject Parcel #5").  Within Subject Parcel #5, agents recovered a silver mylar bag containing two smaller plastic baggies containing approximately 17.293 grams of cocaine and approximately 10.489 grams of crack cocaine, respectively.  Within one of these baggies was a substance that field tested positive for cocaine and within the other baggie was a substance that field tested positive for crack cocaine. The drug evidence items were processed and sent to the DEA laboratory for testing.  The return address on Subject Parcel #5 was, "Gregory Glassgow, 5115 Norma Elaine Rd, West Palm Beach, FL 33417-4738."

58.     On or about July 6, 2021, an investigator from outside the Southern District of

Florida conducted an undercover purchase from a vendor using a different moniker than Bighorndodge on the Marketplace 4 Dark Web market.[8]  Marketplace 4 operates similarly to other illicit Dark Web marketplaces described herein.  On or about July 13, 2021, this investigator recovered a parcel through USPS containing their order of 3.9 grams of a substance that field tested positive for cocaine (hereinafter "Subject Parcel #6").  The suspected cocaine was packaged in a clear plastic baggie within a silver foil baggie.  The return address on this parcel was, "Gregory Glassgow 5115 Norma Elaine Rd, West Palm Beach, Florida 33417-4738."  This return address matched prior parcels sent out by CROOKS in response to orders made to the Bighorndodge moniker on other marketplaces.

59.    On or about July 6, 2021, an investigator from the Southern District of Florida conducted an undercover purchase of 5 units of a product listing of "7 Grams Crack Cocaine" – or 35 grams total – from Marketplace 3 for $3,520 worth of Bitcoin, including market and shipping costs.  On or about July 15, 2021, agents recovered and opened the ordered parcel (hereinafter "Subject Parcel #7").  The return address on this parcel was, "Gregory Glassgow 5115 Norma Elaine Rd, West Palm Beach, Florida 33417-4738." Within the parcel, agents recovered approximately 39.77 grams of a substance consistent in appearance with crack cocaine.  A field test of the substance was conducted and returned a positive result for Cocaine Base, also known as crack cocaine.  The drug evidence was turned over to the DEA for processing.

60.    On or about July 21, 2021, an agent from the Southern District of Florida conducted an undercover purchase of 7 grams of crack cocaine from a vendor named Bighorndodge on the Marketplace 4 Dark Web market.  On or about July 28, 2021, the parcel (hereinafter "Subject Parcel

---

[8] Moniker omitted to protect an ongoing investigation of a multi-drug vendor or vendor group out of an outside federal district.

#8") was recovered at the undercover address provided by the agent.  On or about August 5, 2021, agents opened the subject parcel containing their order and recovered a silver mylar bag within which was approximately 10.2 grams of a hard off-white substance that field tested positive for crack cocaine. The return address on this parcel was, "5115 Norma Elaine Rd, West Palm Beach, Florida 33417-4738."

61.     On or about August 19, 2021, an investigator from outside the Southern District of Florida conducted an undercover purchase from a vendor using a different moniker than Bighorndodge on the Marketplace 4 Dark Web market.[9]  On or about August 26, 2021, the investigator recovered a parcel through USPS containing their order of 34 grams of a substance that field tested positive for cocaine (hereinafter "Subject Parcel #9").  The suspected cocaine was packaged in a clear plastic baggie within a silver foil baggie.  The return address on this parcel was "Gregory Glassgow, 5115 Norma Elaine Rd, West Palm Beach, Florida 33417-4738."

62.     All of the above-mentioned marketplaces operate in a manner similar to the standard Dark Web marketplace as described in the opening paragraphs of this affidavit.

### K. Financial Investigation

63.     Investigative personnel conducted a review of the financial account information of CROOKS' accounts with Regions Bank, Chase Bank, TD Bank, Bitstamp, Ltd. cryptocurrency exchange, and Gemini Trust Co. cryptocurrency exchange.  Based upon this review, agents found evidence that CROOKS was engaged in the structuring of transactions and the laundering of drug proceeds through cryptocurrency exchanges into his personal bank account wherefrom he withdrew funds to cash.

---

[9] Moniker omitted to protect an ongoing investigation of a multi-drug vendor or vendor group out of an outside federal district.

64.     Bitstamp, Ltd. (hereinafter "Bitstamp") is a cryptocurrency exchange that offers the financial service of converting cryptocurrencies – to include Bitcoin – into traditional, also called "fiat" currencies.  Exchanges such as Bitstamp are considered financial service providers under federal law and are subject to regulations commonly applied to such businesses.  In response to a subpoena request for records related to CROOKS' accounts, Bitstamp provided records showing CROOKS had made approximately $42,427.16 worth of cryptocurrency deposits from August 8, 2020 to December 10, 2020.  The records revealed that the company had closed CROOKS' account, noting: "Bitstamp closed/terminated client's account, due to suspicious incoming crypto transactions which have been identified as indirect transactions from dark market related bitcoin addresses."

65.     Gemini Trust Co. (hereinafter "Gemini") is a cryptocurrency exchange that offers the financial service of converting cryptocurrencies – to include Bitcoin – into fiat currencies.  In response to a subpoena, Gemini provided records regarding CROOKS' accounts.  In opening this account with Gemini, CROOKS provided an image of the photograph page of his US Passport.

66.     CROOKS also provided Gemini with a phone number (561-541-0500) and email address (jobshelter@yahoo.com) associated to him by multiple financial and business service records, including his Coinbase Account.  Gemini's records revealed that between January 1, 2021 to April 21, 2021, CROOKS had deposited approximately $342,203.66 worth of cryptocurrency

into a Regions Bank account from this Gemini cryptocurrency account.  *See* Figure 8 below:

| Date | Withdrawal Amount | Date | Withdrawl Amount | Date | Withdrawal Amount |
|---|---|---|---|---|---|
| 1/4/2021 | $ 8,600.00 | 2/11/2021 | $ 9,786.38 | 3/19/2021 | $ 9,600.00 |
| 1/7/2021 | $ 8,200.00 | 2/12/2021 | $ 9,670.64 | 3/23/2021 | $ 9,788.00 |
| 1/19/2021 | $ 4,624.30 | 2/16/2021 | $ 8,627.25 | 3/25/2021 | $ 9,800.00 |
| 1/21/2021 | $ 7,114.20 | 2/17/2021 | $ 9,681.30 | 3/26/2021 | $ 9,700.00 |
| 1/25/2021 | $ 8,306.10 | 2/26/2021 | $ 8,997.14 | 3/29/2021 | $ 9,875.59 |
| 1/27/2021 | $ 9,300.00 | 3/2/2021 | $ 9,743.12 | 4/5/2021 | $ 9,854.54 |
| 1/28/2021 | $ 4,454.03 | 3/4/2021 | $ 9,631.22 | 4/6/2021 | $ 9,601.84 |
| 1/29/2021 | $ 2,713.81 | 3/5/2021 | $ 5,133.93 | 4/7/2021 | $ 9,924.20 |
| 2/3/2021 | $ 7,375.18 | 3/8/2021 | $ 9,391.18 | 4/13/2021 | $ 9,435.65 |
| 2/3/2021 | $ 8,990.71 | 3/9/2021 | $ 7,223.12 | 4/14/2021 | $ 9,700.00 |
| 2/8/2021 | $ 9,664.28 | 3/15/2021 | $ 9,664.99 | 4/15/2021 | $ 9,665.00 |
| 2/9/2021 | $ 9,657.12 | 3/16/2021 | $ 9,677.15 | 4/20/2021 | $ 9,765.00 |
| 2/10/2021 | $ 9,764.22 | 3/18/2021 | $ 9,800.00 | 4/21/2021 | $ 9,725.47 |

*Figure 8*

67.    Regions Bank provided records for CROOKS' accounts in response to a subpoena. These records revealed a regular withdrawal of cash matching, or nearly matching, the deposits from the Gemini account. *See* Figure 9 below:

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 1/4/2021 | $ 7,500.00 | 2/12/2021 | $ 9,000.00 | 3/26/2021 | $ 9,000.00 |
| 1/8/2021 | $ 8,000.00 | 2/16/2021 | $ 5,716.54 | 3/31/2021 | $ 9,000.00 |
| 1/19/2021 | $ 4,200.00 | 2/16/2021 | $ 9,000.00 | 4/2/2021 | $ 9,000.00 |
| 1/21/2021 | $ 5,500.00 | 2/17/2021 | $ 8,500.00 | 4/5/2021 | $ 9,400.00 |
| 1/25/2021 | $ 8,000.00 | 2/26/2021 | $ 9,000.00 | 4/7/2021 | $ 9,000.00 |
| 1/27/2021 | $ 8,500.00 | 3/2/2021 | $ 9,000.00 | 4/8/2021 | $ 8,000.00 |
| 1/29/2021 | $ 6,000.00 | 3/4/2021 | $ 8,500.00 | 4/12/2021 | $ 9,200.00 |
| 2/2/2021 | $ 1,800.00 | 3/5/2021 | $ 9,000.00 | 4/13/2021 | $ 9,000.00 |
| 2/4/2021 | $ 8,500.00 | 3/8/2021 | $ 9,000.00 | 4/16/2021 | $ 9,000.00 |
| 2/5/2021 | $ 5,000.00 | 3/10/2021 | $ 9,000.00 | 4/20/2021 | $ 4,000.00 |
| 2/8/2021 | $ 8,500.00 | 3/15/2021 | $ 9,000.00 | 4/21/2021 | $ 9,200.00 |
| 2/9/2021 | $ 8,000.00 | 3/22/2021 | $ 6,000.00 | | |
| 2/11/2021 | $ 8,500.00 | 3/22/2021 | $ 22,821.83 | | |

*Figure 9*

68.    An analysis of each of the above tables shows a conspicuous pattern with deposits from Gemini to Regions Bank just below the $10,000 financial reporting threshold[10] on days close-

[10] A part of the *Currency and Foreign Transactions Reporting Act,* the Bank Secrecy Act of 1970 requires Banks to report any deposits and withdrawals that they receive of more than $10,000 to the Internal Revenue Service.  The

in-time to the deposit in the Gemini account.  Furthermore, withdrawals similarly just under the $10,000 reporting requirement from Regions Bank to cash were made on either the same or a consecutive day (or days) following the deposits from Gemini.  This pattern appears to show CROOKS deliberately arranging his deposits and withdrawals to keep these transactions below reporting requirements.  Based on my training and experience, CROOKS seems to be using his Regions Bank account as a funnel account through which he reduces the cryptocurrency he has obtained through his Dark Web transactions to cash and has done so in a deliberate attempt to evade federal financial reporting requirements as outlined in Title 31.

69.    Records indicate that CROOKS did not report a legitimate source of income to the State of Florida during the relevant time-period.  Furthermore, analysis of CROOKS' Gemini activity does not show any extensive buying and selling of cryptocurrency in the manner of an individual drawing profits from cryptocurrency trading.

## L.  Aggregates of Drug Weight Total Across Multiple Dark Web Marketplaces

70.    Investigators conduced an analysis of the "Review Section" on multiple marketplaces to ascertain the weight of narcotics based upon customer reviews on marketplaces for Bighorndodge. As previously described above, such review/comment sections are available to customers following the completion of an order.  The sections are maintained as part of the website infrastructure of the Dark Web market itself and are viewable as part of the vendor's profile page. Your affiant is aware, through training and experience, that customers rely on these reviews to discern whether a vendor reliably delivers drug products on time and of good quality.  In endeavoring to create Dark Web market vendor accounts, vendors tacitly agree to have these review

---

act was created to help prevent criminals from using financial institutions to hide or launder illegally transacted cash payments and receipts.

sections visible on their marketplace profile pages.

71.     On the Marketplace 4, from which investigators conducted purchases in July and August of 2021, Bighorndodge's profile contained such a review section.  Investigators' review of the approximately 1,200 reviews in that section led to a minimum calculation that 8,286 grams of cocaine and 652 grams of cocaine base, also called "crack cocaine," had been sold by Bighorndodge to various customers between the dates of November 4, 2020 and September 1, 2021.  The estimated transacted amount of cryptocurrency for these transactions has a value of approximately $514,768.00 USD.[11]

72.     On Marketplace 3, from which investigators conducted a purchase in July 2021, Bighorndodge's profile contained such a review section.   Investigators' review of the approximately 77 reviews in that section led to a minimum calculation that 781.5 grams of cocaine and 67 grams of cocaine base, also called "crack cocaine," had been sold by Bighorndodge to various customers between the dates of December 16, 2020 and September 1, 2021.  The estimated transacted amount of cryptocurrency for these transactions has a value of approximately $49,000 USD.

73.     On the Marketplace 1, from which investigators conducted online purchases in November 2020 and March 2021, Bighorndodge's profile contained such a review section. Investigators' review of the approximately 1,872 reviews in that section led to a minimum calculation that 18,975.5 grams of cocaine and 1,519 grams of cocaine base, also called "crack cocaine," had been sold by Bighorndodge to various customers between the dates of October 2020 (no specific date provided) and September 1, 2021.   The estimated transacted amount of

---

[11] It should be noted that the value of cryptocurrency fluctuates readily.  This, and the following paragraphs, estimates reflects the total value of cryptocurrency transacted over Marketplaces 1, 3, and 4 in September 2021 of the review-section's drug totals, as  calculated by investigators.

cryptocurrency for these transactions has a value of approximately $1,219,200 USD.[12]

74.     Marketplace 2 shut down permanently in Spring 2021 and the review section could not be analyzed by investigators.

75.     Based on the above information, CROOKS sold approximately 28,043 grams of cocaine and 2,238 grams of crack cocaine on the Marketplace 4, Marketplace 3, Marketplace 1 under the vendor name Bighorndodge, including those amounts sold directly to law enforcement.

## CONCLUSION

76.     Based on the foregoing, I submit that probable cause exists to believe that Andre CROOKS aka Bighorndodge committed violations of Title 21, United States Code, Section 846 (conspiracy to distribute controlled substances in violation of Title 21),  violations of Title 21, United States Code, Section 841(a)(1) (distribution of controlled substances), violations of Title 31, United States Code, Section 5324 (structuring transactions to evade reporting requirements), and violations of Title 18, United States Code, Section 1956 (money laundering).

FURTHER YOUR AFFIANT SAYETH NAUGHT.

Gregory Hoffman
Special Agent
Federal Bureau of Investigation

Sworn and Attested to me by Applicant by Telephone per Fed.R.Crim.P. 4(d) and 4.1. by Telephone (FaceTime) on October 12th , 2021.

HONORABLE WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE

---

[12] For Marketplace 1, the review section did not include the amount spent by customers as was shown on Marketplaces 3 and 4.  This estimate assumed pricing to be similar among Bighorndodge's listings on various marketplaces.

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

### <u>PENALTY SHEET</u>

**Defendant's Name:**   Andre Crooks, aka Bighorndodge

**Case No:**   21-MJ-8392-WM

Count #: 1

Conspiracy to Distribute Controlled Substances

Title 21, United States Code, Section 846

**\*Max. Penalty:**   40 Years' Imprisonment, $250,000 fine, Supervised Release up to 5 Years, $100 Assessment

Count #: 2

Distribution of Controlled Substances

Title 21, United States Code, Section 841(a)(1)

**\*Max. Penalty:**   40 Years' Imprisonment, $250,000 fine, Supervised Release up to 5 Years, $100 Assessment

Count #: 3

Structuring Transactions to Evade Reporting Requirements

Title 31, United States Code, Section 5324(a) & (d)(2)

**\*Max. Penalty:**   10 Years' Imprisonment, $500,000 fine, Supervised Release of up to 3 years, $100 Assessment

Count #: 4

Money Laundering

Title 18, United States Code, Section 1956(a)(1)(A)(i)

**\*Max. Penalty:**   20 Years' Imprisonment, fine of not more than $500,000 or twice the value of the property involved in the transaction, Supervised Release of up to 3 years, $100 Assessment

**\*Refers only to possible term of incarceration, fines, special assessments, does not include possible restitution, parole terms, or forfeitures that may be applicable.**